IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


LEANNA S. MARTIN                                                            PLAINTIFF

v.                              NO. 1:18-cv-00004 JM/PSH

NANCY A. BERRYHILL, Acting Commissioner                                     DEFENDANT
of the Social Security Administration


## FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following proposed Findings and Recommendation have been sent to United States District Judge James M. Moody Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

Plaintiff Leanna S. Martin ("Martin") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Martin maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] Specifically, Martin maintains that her residual functional capacity was erroneously assessed and offers two reasons why: 1) the ALJ gave insufficient reasons for discounting a consulting physician's opinions, and 2) the ALJ did not consider the possibility that Martin's failure to consistently keep her mental health treatment appointments was itself due to her mental impairments.

The record reflects that Martin was born on September 12, 1979, and was thirty-five years old on November 1, 2014, the alleged onset date. She filed applications for disability insurance benefits and supplemental security income payments on January 5, 2015, and alleged that she was disabled as a result of, inter alia, mental impairments.

The medical evidence relevant to Martin's mental impairments reflects that she sought medical attention for them prior to the alleged onset date. For instance, Martin saw Dr. Donald Wright, M.D., ("Wright") on January 13, 2014, complaining of worsening depression/anxiety and reported being easily upset by trivial events. See Transcript at 484-488. Wright discontinued Martin on citalopram and began her on sertraline.

---

[1] The question at bar is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

2

Martin saw Wright again on June 16, 2014. See Transcript at 492-496. Martin continued to report problems with depression and anxiety. Wright discontinued Martin on sertraline and began her on fluoxetine.

On September 23, 2014, Martin was seen by Dr. Tammy Berke, Ph.D., ("Berke") for a mental health evaluation. See Transcript at 459-466. Berke recorded Martin's presenting problems to be as follow:

> I have a big problem being around big crowds. I have a problem with anger. I don't have any drug problems. I have real bad panic attacks. They can hit me when I am driving or just sitting. I think I have some depress[ion]. I just don't want to be around anyone or go any [where], even family. I have never been like this before and I don't know why it hit me. I have gained weight and it affects my self esteem. She states that she obsesses alot. Her husband is 50. She has always felt threatened by his previous wife, who died from a homicidal suicidal event her BF. She died 7-8 [years] ago. She states that she still obsesses over her, afraid that her husband still loves her. She [has] always been worried that he could have been seeing his ex wife while they were married.
>
> …
>
> She states remembering panic attacks starting about 4 yrs. The first panic attack she had[,] she had to go to the emergency room. She found out at age 12 that her father was not her real father. He drank a lot and was mean. She may have a real issue of not knowing of her bio father. She started having anxiety around people about 4 years. Went through a period of drinking around 21-30. She has 2 children, daughters age 14 and 9. She has been married 13 years. Depression started about 3 years ago.

See Transcript at 461. Martin's mood/affect was appropriate but sad, and her thought process was within normal limits. She was not a risk of harm to herself or others, and she expressed no homicidal ideations. Berke diagnosed a panic disorder and a major depressive disorder. Although Berke assigned Martin a Global Assessment of Functioning ("GAF") of fifty, Berke believed Martin's condition could respond favorably to therapy.

3

After the alleged onset date, Martin continued to seek medical attention for her mental impairments. For instance, Martin continued to see Berke for individual therapy and saw her on December 3, 2014. See Transcript at 457-458. Berke recorded Martin's presenting problems to be as follow: "She has increased stressors, taking care of [her] mother and grandmother. Panic attacks have been 2-3X a day. She went to work parttime as a cashier. 'I am ready to [quit]. It is non stop, gets off task, can't remember things, can't focus on the job.'" See Transcript at 457. Martin was oriented as to person, place, and time. Her affect was concurrent with her mood, her appearance was clean and groomed, and she was medication compliant. Berke encouraged Martin to utilize, inter alia, relaxation skills, muscular relaxation, deep breathing, self-calming, and cognitive self-talk to help lessen the severity of her symptoms.

The following day, Jennie Dawson, A.N.P, ("Dawson") prepared a mental health evaluation of Martin. See Transcript at 453-456. Martin's appearance was neat/clean; her affect was appropriate, although her mood was depressed; her thought process was intact; and she reported no suicidal or homicidal ideations. A panic disorder and a major depressive disorder were diagnosed, and she was assigned a GAF of fifty. The following assessment of Martin's mental state was offered:

> Pt endorse sx past 4 yrs and receiving tx per pcp for panic without warning several times daily; depression with social isolation, lack of motivation, mood lability, racing thoughts nightly that affect sleeping-getting about 4 hrs nightly average, rates depression and anxiety 8:10 daily average with 10 severe, mood swings daily and becomes angered and then self isolates. She feels most of this is coming from not know[ing] who her father is. She is motivated to get past this and hopes this will resolv[e].

See Transcript at 455.

Martin saw Berke again on December 18, 2014. See Transcript at 451-452. Martin reported sleeping well with trazodone. She also reported that her other medications have helped reduced her panic attacks and anxiety. Berke additionally noted that Martin reported the following:

> She is still emotionally [haunted] by the fact that when she was 11-12, she found out that [her] father was not her bio father. She has 2 sisters from her bio mother [and her father] is now [her] step father. She is not recovered from the fact that he used to beat her and treated her different than her 2 sisters. They were never abused. She witness[ed] alot of domestic violence with her step father beating her mother.

See Transcript at 451. Martin was oriented as to person, place, time, and situation. Her affect was concurrent with her mood, and she was medication compliant. She reported two to three panic attacks a day and noted that the Christmas season had brought about an increase in her level of stress. Berke continued to encourage Martin to utilize non-medical techniques to help lessen the severity of her symptoms.

Martin saw Berke again on February 3, 2015. See Transcript at 449-450. Martin reported that her grandmother had died since the last time Martin saw Berke. Martin reported that she was with her grandmother at the time of death, and Martin's father was with them, acting inappropriately and saying rude things. Martin was oriented as to person, place, time, and situation. Her affect was concurrent with her mood, and she was medication compliant. Martin reported having three to four panic attacks a day. She reported that the attacks hit her "hard and quick," and she could sometime feel them coming on because her hands would start to sweat, and her heart would begin racing. See Transcript at 449. Berke continued to recommend the use of non-medical techniques to help lessen the severity of the symptoms.

Martin continued to see Berke and/or Dawson throughout 2015 and on into 2016. See Transcript at 596-597 (04/30/2015), 594-595 (04/30/2015), 592-593 (05/18/2015), 590-591 (05/28/2015), 588-589 (09/17/2015), 586-587 (12/16/2015), 584-585 (12/16/2015), 580-583 (12/16/2015), 578-579 (03/31/2016), 576-577 (03/31/2016), 572-575 (04/18/2016). The progress notes from the presentations are generally consistent with the progress notes from the earlier presentations. Specifically, Martin continued to complain of panic attacks and problems stemming from her family and other relationships. She was nevertheless oriented as to person, place, time, and situation; and her affect continued to be concurrent with her mood. Although Martin had been medication compliant, Berke observed in a December 16, 2015, progress note that Martin had stopped taking her medication during an approximately two to three month period "due to interfering with her heart [arrhythmia]." See Transcript at 584. Berke also observed the following in the progress note: "She has missed several appointments 'due to lack of motivation to get off the couch and out of the house.' She states she has been either in bed or on the couch sleeping excessively and not leaving home for the last 2-3 months." See Transcript at 584.

On October 11, 2016, Berke discharged Martin from therapy. See Transcript at 729-730. Berke provided the following reasons for discharging Martin: "discharged due to lack of participation in therapy and missed therapist. Last seen for therapy in March 2016. She has not shown for 2 therapy appointments without calling since then. It has been discussed with her several times that she must be participating in therapy to receive medication management services …" See Transcript at 729. Berke also noted the following in her discharge summary:

> [Martin] has expressed fears that her ex husband sexually molested her daughter and has tried to terminate her daughter's visitations. She has reported this and it has been unfounded. She continues to express this as a primary source of anger, anxiety, and depressions. She has attended 7 therapy sessions over the last 2 years. She states she wants therapy so she can continue to get her medications, but she does not follow through with making or keeping appointments. She has made little progress due to her not participating in therapy. She reported in March worsening of symptoms due to [finding?] out that mother has cancer and [daughter] "trying to strangle herself at school." [Daughter] is in counseling at Dayspring. She last reported that panic attacks have worsened and she has phobia of leaving home. However, she has failed to follow through with therapy and when asked about it, she will make excuses and still state she has to have therapy. She wants to stay in medication management.

See Transcript at 729-730.

On May 14, 2015, Martin was seen by Dr. Nancy Bunting, Ph. D., ("Bunting") for a mental status and evaluation of adaptive functioning. See Transcript at 566-570. Bunting summarized Martin's allegations of present mental illness and history of psychiatric treatment in the following manner:

> [Martin] stated that she has had anxiety/panic attacks for 5 years and it has interfered with working because she cannot concentrate.
>
> [Martin's] only suicide attempt was by overdose at the age of 13, and her last suicidal thoughts were at that time. She has homicidal ideation, but no plans. Her appetite is normal, and her weight is stable. With her medication her sleep is "better," and she usually sleeps for 6 hours at night. [Martin] takes no naps. She reported a history of nightmares (i.e. wakes crying) 1 x 2-3 months for the last year. She has no history of true mood cycles. When she gets really nervous, her hands and feet sweat, she feels dizzy, and it is hard to breathe. These now occur 2-3 x month. Her energy level is "not good," and she rated it at 3 on a scale of 1=puddle on the floor/cannot move to 10=energizer bunny. She said that her concentration varies. She gets out of the house 1 x week.
>
> [Martin] has no history of treatment for drug or alcohol abuse or psychiatric hospitalization. Her only outpatient counseling has been seeing someone at HRA since November 2015. She now sees the therapist 1 x month.

7

> [Martin] did bring her medications. These included: venlafaxine 75 mg 1 x day from J. Thompson and Abilify 10 mg 1 x day and clonazepam 1 mg 3 x day PRN from J. Davidson, APRN. [Martin] has been on these for 3 weeks. She takes these regularly and has no problems with them. She did not know if they helped.
>
> [Martin] reported no obstacles that prevented her from receiving mental health treatment.

See Transcript at 566. Martin's mood was anxious; her affect was flat; but her thoughts were logical, relevant, and goal directed. Bunting diagnosed a mild neurocognitive disorder and a generalized anxiety disorder. With respect to Martin's adaptive functioning, Bunting opined the following:

> [Martin] can do all of her self-care routines. …
>
> [Martin] drove by herself to the appointment today. She now will drive by herself only in Mountain Home because she cannot handle traffic. She can shop by herself if she takes her clonazepam to control her anxiety. She does not presently use a check book, and she previously had problems with one. She has no difficulties counting change. She does not pay bills on time and this is "getting worse" as she does not want to. She does household chores including laundry, washing dishes, sweeping, vacuuming (sometimes depending on mood), and cleaning. She no longer cooks as she does not "feel" like it. She spends her time watching television, listening to the radio and other music, and using the internet for finding recipes, facebook, and Pinterest. She enjoys cooking and fishing (big smile), especially as they have just gotten a pontoon boat.
>
> [Martin] reported she gets along with her husband "good." She is in contact with her half-sisters. Her mother and stepfather are still alive, live in ND, and she is in contact with them. She has no friends, and she is not involved in church or any other groups. She has contact with her neighbors.
>
> [Martin] communicated and interacted in a socially adequate manner for a superficial conversation.
>
> [Martin] sometimes could communicate in an intelligible and effective manner.

> [Martin's] performance on serial 3s was poor. She counted backwards from 20 adequately. Her immediate recall was adequate, and her digit span was in the borderline range. She has little capacity to cope with the cognitive demands of basic work like tasks. She has a history of being able to deal with co-workers and bosses by her report. She has the ability to deal with the public in routine and superficial interactions only based on her behavior in the interview. She can not handle some work stress or changes at this time as her anxiety is fueled by clear cognitive deficits. She can follow instructions from supervisors if given one at a time.
>
> [Martin] could attend and sustain her concentration in the interview which focused on herself. ... Her concentration does not appear[] adequate for basic tasks in light of the other cognitive deficits seen in this interview.
>
> [Martin] was able to persist in the interview. She is capable of doing this for at least short periods of time. Her frustration tolerance is limited by the cognitive deficits seen in this interview.
>
> [Martin] is not able to complete work like tasks within an acceptable timeframe.

See Transcript at 569-570. Bunting believed Martin gave her best level of effort and cooperation and noted no indications of malingering or exaggeration.

Martin testified during the administrative hearing about her mental impairments. See Transcript at 60-78, 86-88. She completed the eleventh grade in school but never received a high school diploma or completed a high school equivalency diploma program. She experiences panic attacks and has difficulty being around large groups of people. She has taken clonazepam for panic attacks and diazepam, trazadone, and citalopram for depression and anxiety, although she was not taking them at the time of the hearing. When Martin was asked why she stopped keeping her mental health treatment appointments, she answered as follows:

> CLMT: Because I've had a lot of death in my family on my husband's side. His mother had passed, and I was very close to her. And—

9

> ALJ: Well, don't you think Health—that's what therapy is for, for situations such as that?
>
> CLMT: Yeah, but I couldn't get out of bed on a lot of them days. Depression and—
>
> ALJ: Okay. Well, the notes say that over a two year therapy period, you went seven times, and then you wouldn't call them back to fill in the appointments, or missed all your appointments.
>
> CLMT: Yes. I have a hard time of getting up on a daily basis.

See Transcript at 69. Martin has had thoughts of suicide because she believes she cannot "live [her] life;" she cannot "enjoy it with [her] kids because [she is] in so much pain." See Transcript at 70. She cannot cope with basic work-like tasks and cannot cope with stress. If she were to work, she would work very slow and not within an acceptable timeframe. She hopes to re-start individual therapy after she has had a period to recover from the death of her mother-in-law.

Martin's husband also testified during the administrative hearing. See Transcript at 78-86. He has had to leave work on occasion to assist Martin after one of her panic attacks. They occur so often that the family is prevented from visiting loved ones. He has noticed that she has difficulty focusing, concentrating, and remembering.

Martin's medical records were reviewed by state agency medical consultants. See Transcript at 98-113, 114-129, 132-148, 149-165. With respect to her mental capabilities, they agreed that she is capable of performing work-related activities involving the following: "[Martin] is able to perform work where interpersonal contact is incidental to work performed, e.g., assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct, and concrete." See Transcript at 110, 162.

At step two of the sequential evaluation process, the ALJ found that Martin's severe impairments include a general anxiety disorder, a major depressive disorder, and a mild cognitive disorder. The ALJ assessed Martin's residual functional capacity and found that Martin is capable of performing sedentary work but with the following restrictions caused by her mental impairments: "… [Martin] can perform simple, routine tasks with occasional changes in routine work setting; she can have superficial contact with the public or coworkers, … limited to meet and greet type situations." See Transcript at 21. In making the assessment, the ALJ gave little weight to Bunting's opinions because they were inconsistent with her own findings and observations and were inconsistent with the other medical evidence. With regard to Bunting's diagnosis of a mild neurocognitive disorder, the ALJ found that "[n]o treating source diagnosed the condition and [Martin] "regularly was oriented to person, place, time, and situation." See Transcript at 24. The ALJ also noted that the results of Bunting's examination were "unique in that [Martin] appeared only a little anxious without any depression leading to the failure of … Bunting to include social limitations." See Transcript at 24. In making the assessment, the ALJ also gave significant weight to the opinions of the state agency medical consultants. At step four, the ALJ found that Martin is unable to perform her past relevant work. The ALJ found at step five, though, that there are other jobs Martin can perform. As a result, the ALJ concluded that Martin was not disabled for purposes of the Social Security Act.

Martin maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole. Martin so maintains, in part, because the ALJ gave insufficient reasons for discounting Bunting's opinions.

11

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all the relevant evidence in the record and must be supported by "'medical evidence that addresses the claimant's ability to function in the workplace.'" See Id. at 539 [quoting Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003)].

As a part of considering the medical evidence, the ALJ must weigh the various medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). The ALJ may reject the opinion of a medical expert if the opinion is "inconsistent with the medical record as a whole," see Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995), or the medical expert renders inconsistent opinions that undermine the credibility of the opinions, see Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006). As a general proposition, the opinions of a treating medical expert are accorded greater weight than the opinions of a consulting medical expert, whose opinions are typically given limited weight. See Anderson v. Heckler, 738 F.2d 959 (8th Cir. 1984). The opinions of the medical experts who examined the claimant are generally accorded greater weight than the opinions of medical experts who did not examine the claimant. See Wildman v. Astrue, 596 F.3d 959 (8th Cir.2010).

The manner in which an ALJ resolves a conflict in the medical evidence will be disturbed only if it falls outside the "available zone of choice." See Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) [internal quotation omitted]. A decision is not outside the "available zone of choice" simply because the court may have reached a different conclusion had it been the finder of fact. See Id.

The reasons the ALJ gave for discounting Bunting's opinions are supported by substantial evidence on the record as a whole and within the "available zone of choice." The undersigned so finds for two reasons.

First, the ALJ could and did discount Bunting's opinions because they are inconsistent with Bunting's own testing and observations. Bunting opined that Martin's mental impairments give rise to difficulties coping with the cognitive demands of basic work-like tasks, an inability to handle some work stress or changes, difficulties concentrating, and an inability to complete work-like tasks within an acceptable timeframe. While it is true that Martin's performance on "serial 3s" was poor and her "digit span" was in the borderline range, she could count backwards from twenty, had an adequate "immediate recall, and could name the current President of the United States and his three predecessors. Bunting noted that Martin can perform her self-care routines, drive an automobile, shop by herself if she takes her medication, and count change despite having some difficulty using a checkbook. Bunting also noted that Martin spends time using the internet for finding recipes and using Facebook. Bunting opined that Martin cannot handle some work stress or changes as "her anxiety is fueled by clear cognitive deficits," but the evidence supporting the finding is scant.

Although Bunting observed that Martin's mood was anxious and her affect flat, Bunting also observed that Martin's thoughts were logical, relevant, and goal directed. Martin reported getting along with her husband and having contact with her family and neighbors, although she had no friends. She reported the ability to deal with co-workers, bosses, and "the public in routine and superficial interactions." It is also telling, as the ALJ noted, that Bunting imposed few social limitations upon Martin.

Second, the ALJ could and did discount Bunting's opinions because they are inconsistent with the record as a whole. Although Bunting found that Martin had limitations caused by a mild neurocognitive disorder, it does not appear that Berke, Dawson, or the state agency medical consultants made similar findings. For instance, although Berke and Dawson consistently diagnosed depression, anxiety, and a panic disorder, Berke and Dawson do not appear to have identified any limitations caused by a neurocognitive disorder. In fact, Berke opined on at least two occasions that Martin does not have a neurocognitive disorder. See Transcript at 573, 581. Berke and Dawson consistently observed that Martin was oriented as to person, place, time, and situation, and her affect was typically concurrent with her mood. It is also worth noting that Martin was able to complete the eleventh grade in school.

Bunting found that Martin has limitations caused by depression, anxiety, and a panic disorder, a finding supported by Berke, Dawson, and the state agency medical consultants and adopted in part by the ALJ. The question for the ALJ was not whether Martin has such limitations; the question was the extent to which the limitations impact the most Martin can do despite the limitations. Bunting, Berke, and Dawson all noted Martin's tragic history, e.g., a history of abuse and neglect, having lived in a household where her mother was abused, the knowledge that her father was not her biological father, fears that her daughter had been sexually molested and had attempted to harm herself, and the death of close family members. Nevertheless, Berke and Dawson, unlike Bunting, identified few limitations on Martin's ability to perform work-related activities because of her agonizing history, and many of her problems appear to have been situational in nature.

Martin was seen on a number of occasions by medical professionals other than Berke and Dawson for complaints not involving Martin's mental status. The progress notes from those presentations nevertheless shed some light on Martin's mental status and are inconsistent with Bunting's opinions. Martin was repeatedly observed to have a normal mood and affect, an intact memory, no deficits in memory or concentration, and oftentimes denied having any anxiety. See Transcript at 436, 442, 690, 697, 701, 704-705, 722, 725, 741-742, 749-750.

Whether the ALJ grants a physician's opinions substantial or little weight, the ALJ must always give good reasons for the weight given the opinions. Here, the ALJ gave good reasons for the manner in which he weighed Bunting's opinions.

Martin faults the ALJ for failing to consider the possibility that Martin's failure to consistently keep her mental health treatment appointments was itself due to her mental impairments. In support of the assertion, Martin cites the Court to Pate-Fires v. Astrue, 564 F.3d 935 (8th Cir.2009). In that case, the claimant suffered from a severe bipolar disorder that caused manic behavior, homicidal threats, paranoid delusions, significantly impaired insight, and a complete denial of the impairment. "Although there was overwhelming evidence in the record expressly indicating that the claimant's severe mental disorder caused her noncompliance with psychiatric medication, the ALJ held that such noncompliance was not justified." See Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010). The Court of Appeals reversed, "concluding that the ALJ's decision failed to recognize that the claimant's noncompliance was a manifestation of her schizoaffective disorder and that noncompliance with psychiatric medication is common among persons with such disorders." See Id.

The ALJ in this instance gave little attention to the possibility that Martin's failure to consistently keep her mental health treatment appointments was itself due to her mental impairments. The ALJ's failure to give extensive attention to such a possibility, though, does not warrant a remand.

"Whether severe mental illness has resulted in justifiable noncompliance is a fact-intensive issue." See Hensley v. Colvin, 829 F.3d 926, 935 (8th Cir. 2016). Because it is, the decision in Pate-Fires has, on occasion, been distinguished. For instance, it has been distinguished on the ground that a claimant's mental impairments are not as extreme as the claimant's mental impairments were in Pate-Fires, see Guthrie v. Colvin, 2014 WL 5023508 (W.D.Ark. 2014), and when there is no evidence linking a claimant's mental limitations to her noncompliance, see Wildman v. Astrue, supra.

The case at bar is distinguishable from Pate-Fires in two respects. First, there is little evidence that Martin's depression, anxiety, and panic attacks cause the type of manic behavior, homicidal threats, paranoid delusions, significantly impaired insight, and a complete denial of the impairment as was present in Pates-Fires. Although Martin experiences severe panic attacks, the symptoms were not chronic.

Second, there is not "overwhelming evidence in the record" expressly indicating that Martin's severe mental impairments cause her noncompliance with psychiatric treatment. Instead, there is conflicting evidence on the question of whether her depression, anxiety, and panic attacks cause her noncompliance. For instance, she testified that she was too depressed to get out of bed to attend treatment. Bunting noted, though, that Martin reported no obstacles preventing her from receiving mental health treatment.

The undersigned is obligated to consider evidence that both supports and detracts from the ALJ's decision. See Goff v. Barnhart, 421 F.3d 785 (8th Cir. 2005). "If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision." See Id. at 789 [citing Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001)]. The case at bar is such an instance. It is possible to construe the evidence in such a way as to find that Martin's failure to attend mental health treatment is a result of her mental impairments. It is also possible to construe the evidence in such a way as to find that her failure to do so is not the result of her mental impairments. Because it is possible to draw two inconsistent positions from the evidence, this case should not be remanded.

On the basis of the foregoing, there is substantial evidence on the record as a whole to support the ALJ's findings. The undersigned recommends that Martin's complaint be dismissed, all requested relief be denied, and judgment be entered for the Commissioner.

DATED this 8th day of January, 2019.

_____
UNITED STATES MAGISTRATE JUDGE